## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Richard Kreiner,

                Plaintiff,        Case No. 20-cv-11238

v.                            Judith E. Levy
                                 United States District Judge

Michael Thomas, Steven Chenet,
and Jason Bledsoe,             Mag. Judge Anthony P. Patti

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART DEFENDANT'S MOTION FOR
## <u>SUMMARY JUDGMENT [29]</u>

Plaintiff brought this action under 42 U.S.C. § 1983 against Defendant Michigan State Police ("MSP") Troopers Michael Thomas, Steven Chenet, and Jason Bledsoe, alleging excessive use of force during the execution of a search warrant. Before the Court is Defendants' motion for summary judgment. (ECF No. 29.) The motion is fully briefed. On January 20, 2022, the Court held a hearing and heard oral argument. For the reasons set forth below, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

## I.    Background

The events in this case occurred during the execution of a search warrant at Plaintiff's home on May 8, 2018. Defendants are all members of MSP's Emergency Support ("ES") Team. MSP developed a threat matrix tool called the "Warrant Service Risk Assessment" that investigating officers use to determine whether executing a particular warrant poses a higher-than-normal risk of harm. (ECF No. 29-2, PageID.134–135; *see also* ECF No. 29-4, PageID.147.) The ES Team is assigned to execute a search warrant when that warrant scores above a threshold level (a score of 31 or higher) on the threat matrix tool. (ECF No. 29-4, PageID.147; *see* ECF No. 29-2, PageID.134–135.)

The Thumb Narcotics Unit ("TNU") of the MSP sought to execute a search warrant permitting it to search the bodies of three individuals at Plaintiff's home, including Plaintiff himself. (ECF No. 29-5, PageID.149.) Because the threat matrix scored out at 70,[1] the ES Team was assigned

---

[1] Defendants provided the threat matrix template as an exhibit (ECF No. 29-4, PageID.147) but not the completed threat matrix used to score the search warrant in this case. Defendants allege that the score in this case was 70. (ECF No. 29-5, PageID.149.) Plaintiff contends that the threat matrix should have scored at 27 or below, which is below the threshold scoring for ES Team involvement. (*See* ECF No. 32, PageID.226–227.)

to execute the warrant. (ECF No. 29-5, PageID.149.) As part of the briefing between the TNU and the ES Team, the TNU informed the ES Team that the warrants were part of a methamphetamine distribution and manufacturing investigation. (ECF No. 29-2, PageID.127.) The TNU also informed Defendants that Plaintiff had a felony warrant for conspiracy to manufacture methamphetamine and a felony warrant for harboring fugitives. (*Id*.; ECF No. 29-3, PageID.140.) The fugitives were the other two individuals at Plaintiff's home—his stepson, Steven Braekevelt, and Braekevelt's then-romantic partner, Tina Thomas—both of whom had felony warrants related to the manufacture of methamphetamine. (ECF No. 29-2, PageID.127; ECF No. 29-3, PageID.139, 141.)

Additionally, the ES Team was informed that (1) Plaintiff was "known to be unfriendly to law enforcement"; (2) Plaintiff had noticed that he had been under surveillance as part of this investigation; (3) Plaintiff had militia ties; (4) a few days prior to May 8, 2018, officers from the local Sheriff's Office had responded to Plaintiff's address regarding a domestic dispute involving Thomas and observed various weapons staged

in "defensive or fighting positions" throughout the home[2] (*id.* at PageID.128); (5) Plaintiff's home's driveway was long and had a sensor, such that entry onto the property could likely not be done in secret.[3] (ECF No. 29-2, PageID.127–128; ECF No. 29-3; ECF No. 29-5, PageID.149; ECF No. 29-6, PageID.157; ECF No. 29-7, PageID.168; ECF No. 33-1, PageID.466.) Defendants did not recall whether they were informed about Plaintiff's lack of any previous criminal history at the time of briefing.[4] (ECF No. 29-2, PageID.128; ECF No. 29-7, PageID.174.)

In the early morning on May 8, 2018, at least ten members of the ES Team arrived at Plaintiff's home in an armored vehicle alongside a K-9 unit. (ECF No. 29, PageID.102.) Plaintiff has 16.88-acre property in Attica Township, Lapeer County, MI, and, as set forth above, there is a

---

[2] Plaintiff confirmed during discovery that he had "25 shotguns and rifles" at his residence at the time of the arrest. (*See* ECF No. 29, PageID.100; ECF No. 29-12, PageID.208.)

[3] The ES Team was also informed that Plaintiff's wife, Dolly, was previously in hospice care and had recently passed away. (ECF No. 29-2, PageID.127.) However, it is unclear to the Court how this factor impacts the risk profile of the situation.

[4] Plaintiff asserts that he is not a member of any gun advocacy or militia group and that there was no basis for the statement that Plaintiff previously expressed anti-government beliefs. (ECF No. 32, PageID.225–226; ECF No. 33-1, PageID.470–471.) However, he does not provide evidence challenging Defendants' assertion that this information was provided during the briefing. (*See* ECF No. 32, PageID.225–227.)

long driveway on his property leading up to his home. (ECF No. 33-1, PageID.469–470.)

The team members were placed along the perimeter of Plaintiff's residence in what the ES Team calls a "surround and call-out" maneuver. (ECF No. 29, PageID.100.) None of these team members entered the home itself. (ECF No. 29-2, PageID.136.) The ES Team connected with members of Central Dispatch to call Plaintiff's home to request the residents leave the house with their hands up, but no one responded to the calls. (ECF No. 29-5, PageID.149.)

The ES Team then used a PA system and bright lights to order the residents to leave the home. (ECF No. 29-10, PageID.187.) Plaintiff had been taking a shower when he noticed the noise and lights. (*Id.* at PageID.187–189; ECF No. 33-1, PageID.472.) He opened the bathroom window to inform the ES Team that he had just showered and needed to put clothes on before exiting. (ECF No. 29-10, PageID.188.) Plaintiff did not speak to Steven Braekevelt or Tina Thomas, who were also in the home at that time, before exiting. (ECF No. 33-1, PageID.472.) Plaintiff exited his home wearing a t-shirt, jeans, and socks. (ECF No. 29, PageID.102; ECF No. 29-10, PageID.185; ECF No. 33-1, PageID.491.) He

was not wearing shoes. (ECF No. 29, PageID.102; ECF No. 29-10, PageID.185; ECF No. 33-1, PageID.491.) At the time Plaintiff exited his home, there was a line of ES Team members next to the armored vehicle holding bulletproof shields and facing his home. (ECF No. 33-1, PageID.473.)

The parties offer differing accounts of what happened next. Additionally, Defendants provided dashcam footage from the patrol vehicle that captured a portion of the events, but other events are obstructed from view. (*See* ECF No. 29-9, PageID.181.)

According to Plaintiff, he walked to the end of his wooden walkway and had a conversation with an officer who was using a loudspeaker. The officer used the loudspeaker to order Plaintiff to walk towards the officers and behind the armored vehicle. (*See* ECF No. 33-1, PageID.464–465, 473.) Plaintiff alleges that the conversation between him and the officer on the loudspeaker was calm in tone. (*Id*. at PageID.465.)

Plaintiff walked slowly on the gravel in the direction of the vehicle and informed the ES Team that he had difficulty walking on the stones. (*Id*.) The officer on the loudspeaker repeated their command that Plaintiff needed to walk behind the armored vehicle. (*Id*.) At some point,

Defendant Thomas asked Plaintiff if Braekevelt and Tina Thomas were in the house, and Plaintiff confirmed that they were. (*Id.* at PageID.473, 475.) Plaintiff alleges that he was not informed that he was under arrest during this conversation. (*Id.* at PageID.476.)

As Plaintiff continued walking slowly, Plaintiff alleges that Defendant Thomas approached Plaintiff, grabbed his arm, and started pulling him in the direction of the vehicle; Plaintiff did not remember whether Defendant Thomas spoke to him at that time. (*Id.* at PageID.465.) However, once Defendant Thomas grabbed his arm, Plaintiff pulled his arm away from Defendant Thomas, causing Defendant Thomas to lose his grip, and then Plaintiff said "I can walk, you know." (*Id.* at PageID.475–476.) Plaintiff alleges that he did not state this with agitation. (*Id.* at PageID.490.) Defendant Thomas "instantly" threw a punch in Plaintiff's face. (*Id.* at PageID.466.) Plaintiff alleges he did not take a fighting stance in response. (*Id.* at PageID.476.) Plaintiff did not hear any command to stop resisting or to get on the ground. (*Id.* at PageID.478.) While Plaintiff was standing up, Defendant Thomas

7

punched Plaintiff "at least three times."[5] (*Id.* at PageID.473.) According to Plaintiff, he did not grab Defendant Thomas' vest at any point during these punches, but he alleges that his hand may have been caught in Defendant Thomas' tie or shirt as a defensive move. (*Id.* PageID.477.)

After these three punches, Plaintiff alleges that he was tased[6] by Defendant Thomas in his left bicep, but the tase was "unsuccessful" as Plaintiff remained standing. (*Id.* at PageID.479.) Several officers— Plaintiff was unaware of exactly who—brought Plaintiff to the ground by pushing him several feet down his driveway. (*Id.* at PageID.479, 492.)

When Plaintiff fell to the ground, he was on his knees facing the ground with the side of his face and his ear in the dirt. (*Id.* at PageID.483.) Plaintiff asserts that, while he was on the ground, he did not intentionally grab an officer's leg, but may have accidentally grabbed a leg while falling and trying to avoid getting hit. (*Id.*) Plaintiff also alleges he put his hands out to protect his face when he fell and that he put his hands up to block punches from hitting his face when he was

---

[5] Plaintiff's response brief indicates that Defendant Thomas struck Plaintiff twice in the face before pushing him backwards. (ECF No. 32, PageID.227.)

[6] While Plaintiff testifies in his deposition that this first use of the Taser occurred before he fell to the ground, his response to Defendant's motion for summary judgment does not include this allegation. (ECF No. 32, PageID.227.)

surrounded. (*Id.* at PageID.476–477, 495.) He admits that he did not give his hands "willingly" and that the officers had to pull his hands out from under him because he was trying to protect his head from injury. (*Id.* at PageID.484.)

Plaintiff alleges Defendant Thomas punched him at least twice while Plaintiff was on the ground, including a punch to the side of his face in his jaw. (*Id.* at PageID.474, 481.) Additionally, Defendant Bledsoe kicked Plaintiff—although the complaint alleges that this was in the legs, Plaintiff gives testimony suggesting he did not fully remember where he was kicked but that it might have been in his ribs.[7] (*Id.* at PageID.482.)

Without any verbal warning, Plaintiff was tased in his upper back after he was already handcuffed with zip ties (also known as "flex cuffs"). (*Id.* at PageID.495–496; *see* ECF No. 29-7, PageID.172.) Plaintiff states that he is fairly certain he was already handcuffed during the tasing

---

[7] Plaintiff's response brief alleges that Defendant Bledsoe kicked Plaintiff in the leg, specifically in the common peroneal nerve. (ECF No. 32, PageID.228.) The common peroneal nerve is in the lower leg and provides sensation to the front and sides of the legs, as well as to the top of the feet. Strikes to the common peroneal can lead to what Defendants refer to as "pain compliance" or to temporary numbness in part of the body. (*See* ECF No. 29-7, PageID.174–176.) Furthermore, while Plaintiff does not testify to this in his deposition, Plaintiff's response brief alleges that Defendant Chenet also gave Plaintiff "2 or 4 knee strikes to [Plaintiff's] common peroneal." (ECF No. 32, PageID.228.)

because otherwise he "would have grabbed the wire and ripped it off at that point."[8] (*Id.* at PageID.485–487.) When Plaintiff was tased on the ground, an officer put his foot on Plaintiff's back. (*Id.* at PageID.480.) An officer approached him with a K-9 and told Plaintiff not to move or the dog would bite him. (ECF No. 33-1, PageID.478.) Plaintiff remained on the ground for the remainder of the execution of the warrant.

Defendants present a different version of the events. According to Defendants, while Plaintiff was within three or four feet of the ES Team members holding shields, Defendant Thomas overheard Plaintiff inform the officers that he would not walk any further. (ECF No. 29-2, PageID.129; ECF No. 29-5, PageID.153.) Defendant Thomas, who was tasked with handcuffing, immediately grabbed Plaintiff's arm and attempted to pull him behind the shields and the armored vehicle. (ECF No. 29, PageID.103; ECF No. 29-2, PageID.129.) Plaintiff pulled his hand away from Defendant Thomas and brought it down to his side, and then said "don't touch me." (ECF No. 29-5, PageID.153.) Defendant Thomas

---

[8] Plaintiff's response brief separately alleges that Plaintiff was tased "once for 8 seconds and then again for 15 seconds" but then later suggests that Plaintiff was tased for thirty seconds. (ECF No. 32, PageID.229.) The report generated by the Taser confirms that Plaintiff was tased once for eight seconds and then again for fifteen seconds. (ECF No. 33-5, PageID.599–600; ECF No. 33-6, PageID.621.)

grabbed Plaintiff's arm and pulled him back behind the shields, while telling Plaintiff that he was under arrest. (*Id.*; ECF No. 29-6, PageID.159.) In response, Plaintiff turned to face Defendant Thomas and shouted at him: "No, I'm not." (ECF No. 29-2, PageID.129; ECF No. 29-5, PageID.153; ECF No. 29-6, PageID.159.) Defendant Thomas tried to grab Plaintiff's arm, but Plaintiff again moved it away while Defendant Thomas approached him; the pair moved down the driveway. (ECF No. 29-6, PageID.159; ECF No. 29-7, PageID.177.)

While the two were moving, Defendant Thomas attempted to push Plaintiff away, but Plaintiff dug his heels into the ground and "read[ied] himself for some kind of a fight or an altercation." (ECF No. 29-2, PageID.129.) Defendant Thomas continued to push Plaintiff to get some space, but Plaintiff kept his hands in front of him and close to, or on, Defendant Thomas' ballistic vest. (*Id.*; ECF No. 29-6, PageID.163; ECF No. 29-7, PageID.169, 175.) Defendant Thomas punched Plaintiff in the jaw. (ECF No. 29-2, PageID.129; ECF No. 29-6, PageID.159; ECF No. 29-7, PageID.169.) Defendant Chenet grabbed Plaintiff and pulled him to

the ground in a straight arm bar takedown.[9] (ECF No. 29, PageID.118; ECF No. 29-6, PageID.159.)

Defendant Chenet held onto Plaintiff's arm while Plaintiff fell to the ground (ECF No. 29-2, PageID.130) but then lost control of the arm; Plaintiff instead landed on his arm and curled it under his body. (ECF No. 29-6, PageID.159.) Plaintiff either fell on his hands and knees or his stomach. (ECF No. 29-2, PageID.130.) While Defendant Thomas circled around to follow Plaintiff's head as Plaintiff fell to the ground, Defendant Thomas believed that Plaintiff grabbed one of Defendant Thomas' legs; Defendant Chenet did not see this occur, but Defendant Bledsoe saw Plaintiff wrap his arms around "someone's legs or ankles and his hands were underneath his body." (*Id.*; ECF No. 29-6, PageID.163; ECF No. 29-7, PageID.170.) Because Defendant Thomas believed that Plaintiff was trying to sweep Defendant Thomas' legs out from under him, Defendant Thomas punched Plaintiff's face or head area twice as a distraction technique. (ECF No. 29, PageID.105; ECF No. 29-2, PageID.130; ECF No. 29-5, PageID.153.)

---

[9] A straight arm bar takedown is an "authorized [takedown] technique" "taught through the academy and through the department." (ECF No. 29-6, PageID.159.)

During the entire time that Plaintiff was on the ground, Defendant Thomas and the other officers repeatedly commanded Plaintiff to stop resisting and to put his hands behind his back. (ECF No. 29-2, PageID.130.) Plaintiff continued to not obey the commands to stop resisting; Defendant Chenet and Bledsoe were attempting to get Plaintiff's hands behinds his back, but Plaintiff rolled around to keep his arms underneath him. (*Id.*; ECF No. 29-6, PageID.160; ECF No. 29-7, PageID.171, 173.) Defendant Chenet engaged in a "tug-of-war" with Plaintiff for Plaintiff's right arm as Plaintiff lay flat on his stomach with his arms tucked underneath him. (ECF No. 29-6, PageID.159–160.) Defendant Bledsoe kneed Plaintiff's common peroneal nerve "two or three" times for purposes of pain compliance after several failed attempts at getting Plaintiff's arms out from under him. (ECF No. 29-6, PageID.159–160; ECF No. 29-7, PageID.170–171, 173.) "[W]ell after" Defendant Bledsoe kneed Plaintiff's common peroneal nerve, Defendant Chenet also delivered two to three knee strikes to that same area. (ECF No. 29-6, PageID.159–160, 162.)

Defendant Thomas had a brief conversation with the K-9 handler on site regarding whether to deploy the K-9 partner, and Defendant

13

Thomas stated that it was not necessary at that point. (ECF No. 29-2, PageID.130.) Instead, Defendant Thomas warned Plaintiff to stop resisting and to put his hands behind his back or that he would be tased. (*Id.*) Because Plaintiff failed to do so, Defendant Thomas shouted "Taser, Taser" and fired the Taser into Plaintiff's back from a close range. (*Id.*) The barbs of the Taser hit close together on Plaintiff's back such that Plaintiff was not incapacitated. (*Id.*; ECF No. 29-7, PageID.171.) Defendant Thomas took the Taser and drive stunned Plaintiff in the right knee, with one barb still in Plaintiff's back, to complete the circuit. (ECF No. 29-2, PageID.130; ECF No. 29-7, PageID.171.) Plaintiff was tased for twenty-three seconds in total: first for eight seconds and then for fifteen seconds when Defendant Thomas drive stunned Plaintiff. (ECF No. 29-7, PageID.171.) Following Defendant Thomas' use of the Taser, Plaintiff was handcuffed and sat up on his buttocks; there was no further use of force for the duration of the execution of the warrant. (ECF No. 29-6, PageID.161.)

The dashcam footage offers a third version of the events. In the beginning of the video, a group of approximately six ES Team members are gathered to the left and behind the armored vehicle. Plaintiff exits

14

his home and walks towards the officers and appears to stop before the group of officers on the left. (ECF No. 29-9, PageID.181, 08:17–08:20.) He remains there for a few seconds while Defendant Thomas moves from behind the armored vehicle to stand in front of Plaintiff and between Plaintiff and the camera. (*Id.* at 08:20–08:34.) The two remain there for a few seconds before Defendant Thomas and Plaintiff separate from the group of ES Team members and begin to move behind the group of officers and to the right of the screen, behind the armored vehicle. (*Id.* at 08:34–08:38.)

Defendant Thomas appears to be partially pushing Plaintiff toward the area behind the armored car while holding Plaintiff's right arm. However, Plaintiff is also moving independently with Defendant Thomas while also holding onto Defendant Thomas' arm. (*Id.*) Plaintiff appears to pull his right arm upwards to loosen Defendant Thomas' grip on that arm; Plaintiff's arms are loose and at his sides and then raised upward to above arm level. (*Id.* at 08:38–08:39.) After his grip on Plaintiff's arm is released, Defendant Thomas punches Plaintiff. (*Id.* at 08:37–08:39.) Plaintiff extends his hands in front of Defendant Thomas and appears to be grabbing at Defendant Thomas' clothing, near his neck and shoulder

15

(*id.* at 08:39–08:40) while Defendant Chenet exits the armored vehicle and grabs Plaintiff's back, using the arm bar takedown move to bring Plaintiff to the ground. Defendant Chenet loses his grip on Plaintiff's arm during this process. (*Id.* at 08:39–08:42.) Plaintiff appears to fall on his stomach. (*Id.*)

After Plaintiff falls, he is no longer visible in the video, but Defendants largely remain visible. Once Plaintiff is on the ground, Defendant Thomas punches what appears to be the side of Plaintiff's head and then moves offscreen. (*Id.* at 08:42–08:44.) Defendant Bledsoe kicks Plaintiff three times (*id.* at 08:46–08:51) and then moves slightly toward Plaintiff's head area, kicking twice more. (*Id.* at 08:51–08:59.) Defendant Chenet punches Plaintiff three times. (*Id.* at 09:07–09:09.) From this point forward, Plaintiff and Defendants are no longer visible on screen. Although all parties agree that this is when Defendant Thomas tased Plaintiff, it is not visible on the footage.

All parties agree that Plaintiff did not undergo any medical treatment for his injuries stemming from the use of force. (ECF No. 33-1, PageID.499.) Additionally, all the charges against Plaintiff that

constituted the basis for the warrant were eventually dismissed. (ECF
No. 33-1, PageID.504.)

On May 19, 2020, Plaintiff brought this action claiming excessive
force against all Defendants under 42 U.S.C. § 1983. (ECF No. 1.) On
October 14, 2021, Defendants moved for summary judgment, arguing
that qualified immunity shields them from liability for the excessive force
claim. (ECF No. 29.) That same day, Defendants also filed an *ex parte*
motion for leave to file an exhibit in the traditional manner. (ECF No.
28.) Plaintiff responded to the motion for summary judgment on
November 4, 2021 (ECF No. 32) and filed corrected exhibits on November
10, 2021 (ECF No. 33), to which Defendants replied on November 17,
2021. (ECF No. 34.)

## II.   Legal Standard

### A. Summary Judgment

Summary judgment is proper when "the movant shows that there
is no genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting
that a fact cannot be or is genuinely disputed must support the assertion
by: (A) citing to particular parts of materials in the record . . . ; or (B)

17

showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## B. Qualified Immunity

Section 1983 claims of excessive use of force are subject to the affirmative defense of qualified immunity. *Regets v. City of Plymouth*, 568 F. App'x 380, 386 (6th Cir. 2014). Qualified immunity protects government officials "from liability where [they] reasonably misjudged the legal standard." *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020). Courts analyze whether officers are entitled to qualified immunity using two steps: 1) whether the defendant violated a constitutional right; and 2) whether that constitutional right was clearly established at the time

18

of the alleged violation. *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020). When, as here, a government official raises the defense of qualified immunity, the plaintiff has the burden of demonstrating that the defendant is not entitled to that defense. *Livermore v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). "If either prong is not satisfied, qualified immunity will shield the officer from civil damages." *Marbury v. Karish*, No. 20-cv-10182, 2022 WL 107581, at *3 (E.D. Mich. Jan. 11, 2022) (quoting *Martin v. Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)).

"[W]hen the Court is in a legal gray area, 'the proper course is to grant summary judgment to the officers, even if the court would hold the officers' conduct unconstitutional in hindsight.'" *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 841 (6th Cir. 2018) (quoting *Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015)). But when the "legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Marbury*, 2022 WL 107581, at *3 (quoting *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010)).

### III. Analysis

Defendants' motion for summary judgment is based on their entitlement to qualified immunity from Plaintiff's excessive force claim. (ECF No. 29, PageID.110.) Defendants argue that they did not violate Plaintiff's Fourth Amendment right to be free from excessive force because the force used by each of them was objectively reasonable. (*Id.* at PageID.112–119.) Plaintiff disagrees. (ECF No. 32, PageID.234–247.)

Under the Fourth Amendment, "[w]hen making an arrest or investigatory stop, the police have 'the right to use some degree of physical coercion or threat thereof to effect it.'" *Wright*, 962 F.3d at 865 (quoting *Graham v. Connor*, 590 U.S. 386, 396 (1989)). "To determine whether force is unconstitutionally excessive, [courts] consider 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" *Beans v. City of Massillion*, 706 F. App'x 295, 301 (6th Cir. 2017) (quoting *Graham*, 490 U.S. at 397). This inquiry must be made "from the perspective of a hypothetical reasonable officer in the defendant's position and with his knowledge at the time, but without regard to the actual defendant's subjective intent when taking his actions." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). In other words, the Court must evaluate the "reasonableness at the

moment of the use of force, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Wright*, 962 F.3d at 865 (internal quotation marks omitted).

When reviewing excessive force cases, the Sixth Circuit considers the three non-exclusive factors: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Beans*, 706 F. App'x at 301. "The ultimate question, however, is whether the totality of the circumstances justified the use of force." *Id.* (internal quotation marks omitted).

Courts within the Sixth Circuit "faced with an excessive force case that involves several uses of force must generally analyze the . . . claims separately." *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 529 (6th Cir. 2018) (quoting *Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004) (internal quotation marks omitted). Because this case involves several uses of force, "we analyze each claim in chronological segments." *Id.* (internal quotation marks omitted). The Court thus considers three "segments": before Plaintiff fell, after Plaintiff fell, and Defendant Thomas' use of the Taser.

21

## A. Defendant Thomas' and Defendant Chenet's Use of Force Before Plaintiff Fell

The events that occurred before Plaintiff's fall were captured on the dashcam footage. When a video captures the events underlying the summary judgment motion, courts must "rely mainly on undisputed video footage from . . . the scene." *Ashford*, 951 F.3d at 800; *see also Lang v. City of Kalamazoo*, 744 F. App'x 282, 286 (6th Cir. 2018). On summary judgment, wherever possible, courts must "adopt the plaintiff's version of any facts not caught on film." *Ashford*, 951 F.3d at 800. Additionally, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). Accordingly, the Court must first evaluate the dashcam footage evidence and adopt Plaintiff's version of any facts not caught on the dashcam footage.

Because the video captures the events before Plaintiff's fall, the Court relies on the version of events captured on the video.[10] Here, the

---

[10] Although Plaintiff's response brief alleges that he was punched at least twice (ECF No. 32, PageID.227) (and his deposition indicated that there were "at least three" punches) (ECF No. 33-1, PageID.473) by Defendant Thomas before he fell, the dashcam footage shows that Defendant Thomas punched Plaintiff only once before he

dashcam footage shows that Defendant Thomas punched Plaintiff once and that Plaintiff struggled with Defendant Thomas and attempted to remove his arm from Defendant Thomas' grip. (ECF No. 29-9, PageID.181, 08:37–08:39). It also shows that Defendant Chenet uses the arm bar takedown move to bring Plaintiff to the ground. (*Id.* at 08:39–08:42).

Given these facts, the Court must analyze "whether the totality of the circumstances justified the use of force." *Beans*, 706 F. App'x at 301. Here, all three of the *Graham* factors weigh in Defendants' favor.

The first *Graham* factor—the severity of the crime at issue—favors Defendants. Defendants correctly note that the crimes at issue underpinning the warrant—conspiracy to manufacture methamphetamine and harboring fugitives (ECF No. 29-2, PageID.127; ECF No. 29-3, PageID.140)—are felonies, which is indicative of the seriousness of Plaintiff's crimes under the first *Graham* factor. *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017) (noting that "a crime's status as a felony is an indication of its seriousness" and that this weighs

---

fell. The Court will thus proceed on the basis that only one punch took place before Plaintiff's fall. Neither party disputes that Defendant Chenet used the arm bar takedown move.

in favor of a finding of reasonableness). (ECF No. 29, PageID.113–114.) Plaintiff correctly notes that the crimes were non-violent, which weighs in his favor. (*See* ECF No. 32, PageID.243.) However, it is unclear from Sixth Circuit case law whether a crime's non-violent status is enough to outweigh the fact that it is a felony. *Cf. Bozung v. Rawson*, 439 F. App'x 513, 514, 520 (6th Cir. 2011) (noting that the plaintiff's "misdemeanor offense" of failure to appear in court was neither a violent nor serious crime); *Carpenter v. Bowling*, 276 F. App'x 423, 426 (6th Cir. 2008) ("[T]he charge at issue was disorderly conduct, and the crime of disorderly conduct generally is not a violent or serious crime.") (internal quotation marks omitted); *Latits v. Phillips*, 878 F.3d 541, 549 (6th Cir. 2017) (stating without further analysis that the plaintiff "was originally suspected of possessing narcotics—not a violent crime"). But courts outside of the Sixth Circuit have found that drug crimes are considered serious crimes. *See, e.g.*, *Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018); *Gaxiola v. City of Richmond Police Dep't*, 131 F. App'x 508, 509 (9th Cir. 2005).

Moreover, as the video shows, Plaintiff appeared to resist and obstruct several officers during the execution of the warrant. A plaintiff's

conduct during an interaction with defendant police officers that could lead to additional charges can be considered under the severity factor. *See*, *e.g.*, *Mitchell*, 864 F.3d at 421 (finding that the defendant police officer's use of force was reasonable in part because the plaintiff "likely would have been charged with several serious crimes under Michigan law" for his actions after the defendant arrived on the scene). Because resisting and obstructing police officers is a felony under Michigan Law, *see* Mich. Comp. Laws § 750.81d, the Court can consider this fact under the first *Graham* factor. *See Shumate v. City of Adrian*, 44 F.4th 427, 440–43 (6th Cir. 2022). It is possible that a reasonable officer on the scene would have thought that Plaintiff's resistance and refusal to comply with orders could constitute obstruction under Michigan law.[11] Given this, along with the fact that the crimes underpinning the warrant were felonies, the first *Graham* factor weighs in favor of Defendants.

The second *Graham* factor—whether Plaintiff posed an immediate threat to the safety of the officers or others—also weighs in Defendants' favor. The information Defendants received during the ES Team briefing

---

[11] "'Obstruct' includes the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." Mich. Comp. Laws § 750.81d(7)(a).

25

supported their position that they were reasonable in believing that Plaintiff posed an immediate threat. The combination of Plaintiff's alleged anti-government beliefs, purported militia ties, and the known recent staging of firearms throughout his home led to the ES Team's involvement in the first instance. (ECF No. 29, PageID.114–115.) While Plaintiff argues that "the immediate threat [was] over" as soon as Plaintiff walked out the front door away from his home where the weapons were staged (ECF No. 32, PageID.244), this argument is unpersuasive. It may have been readily apparent to the ES Team that Plaintiff was not carrying a larger firearm like a rifle when he left his home, but this does not preclude the possibility that Plaintiff could have been carrying a smaller firearm concealed in his clothing. That, combined with the fact that Plaintiff resisted the officers, supports the conclusion that he posed an immediate threat to the officers. (*See* ECF No. 29-9, PageID.181.)

Further, under the totality of the circumstances, the Court must consider that the Defendants were executing a warrant in a high-risk environment. The ES Team believed when they arrived at the scene— and Plaintiff admits that he confirmed to the officers after he had left his

26

front door (ECF No. 33-1, PageID.473, 475)—that Tina Thomas and Steven Braekevelt remained in the home when Plaintiff exited. Even if Plaintiff himself posed less of a threat once he left his home, the ES Team also had to consider the danger posed by the fugitives remaining inside of the home.

The third *Graham* factor—whether Plaintiff actively resisted Defendants—also weighs in Defendants' favor. The dashcam video shows that Plaintiff twice pulled his arm away from Defendant Thomas' grip before Defendant Thomas pushed and punched him. Plaintiff engaged in active resistance by pulling his arm away twice and struggling with Defendant Thomas. *Browning v. Edmonson Cnty.*, 18 F.4th 516, 527 (6th Cir. 2021) ("[A]ctive resistance generally means: physical struggles with police, threats toward officers, refusal or resistance to being handcuffed, and erratic or irrational behavior."); *see also Rudlaff*, 791 F.3d at 641 ("Active resistance includes 'physically struggling with, threatening, or disobeying officers' . . . [a]nd it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance.")

Nor is there a genuine dispute that Plaintiff grabbed Defendant Thomas' vest after being punched, and that Defendant Chenet used an arm bar takedown after observing this interaction occur. Considering the potential threat to the ES Team members that Plaintiff and/or the individuals inside his home presented, and Plaintiff's physical defiance, it was reasonable for Defendant Chenet to make the split-second decision to use the arm bar takedown to secure Plaintiff and ensure his safety and the safety of the other officers. *See Earnest v. Genesee Cnty.*, 841 F. App'x 957, 960 (6th Cir. 2021) (holding that it was reasonable for an officer to "utiliz[e] takedowns to subdue [the p]laintiff and manually forc[e] [plaintiff's] hands behind his back so that they could be handcuffed" when the plaintiff "resisted arrest and refused to put his hands behind his back"); *Bozung*, 439 F. App'x at 520 (holding that a defendant officer did not use excessive force by using an arm bar takedown on a plaintiff when the officer did not have the opportunity to search the plaintiff before the takedown, the plaintiff did not comply with the officer's orders to place his hands behind his back, and it was difficult for the officer to judge the plaintiff's intentions). Thus, for the events before Plaintiff's fall, the third *Graham* factor weighs in favor of Defendants.

28

Accordingly, Defendant Thomas' and Defendant Chenet's use of force before Plaintiff's fall was reasonable considering the totality of the circumstances. Because there was no constitutional violation, Defendants Thomas and Chenet are entitled to qualified immunity with respect to the use of force before Plaintiff fell.

## B. Defendants' Use of Physical Force After Plaintiff Fell

The dashcam video captures most of Defendants' actions after Plaintiff fell. The video shows that after Plaintiff fell to the ground, Defendant Thomas punched Plaintiff's face or head area twice (ECF No. 29-9, PageID.181, 08:42–08:44) and Defendant Bledsoe kicked Plaintiff three times (*id.* at 08:46–08:51) before moving slightly toward Plaintiff's head area, where he kicked Plaintiff twice more (*id.* at 08:51–08:59).[12] The dashcam footage also shows that Defendant Chenet punched Plaintiff three times (*id.* at 09:07–09:09). Finally, although it was not visible in the video, Defendant Chenet admitted to kicking Plaintiff's common peroneal nerve, and Plaintiff did not dispute this fact. (ECF No. 29, PageID.106; ECF No. 32, PageID.247.) The parties also agree that Plaintiff did not kick or punch Defendants while on the ground, but

---

[12] Neither party disputes these facts.

Plaintiff did attempt to avoid handcuffing by holding his arms under his body. (ECF No. 29, PageID.116; ECF No. 33-1, PageID.484.)

Given these facts, the Court must again assess "whether the totality of the circumstances justified [Defendants'] use of force." *Beans*, 706 F. App'x at 301 (internal quotation marks omitted). Under the same analysis as above, the first *Graham* factor—the severity of the crime—favors Defendants. The third *Graham* factor also favors Defendants—both parties agree that Plaintiff would not give his hands willingly for Defendants to handcuff him.[13] (ECF No. 29, PageID.116; ECF No. 33-1, PageID.484.) This constitutes active resistance in the Sixth Circuit. *Browning*, 18 F.4th at 527 (stating that active resistance includes "refusal or resistance to being handcuffed").

It is less clear whether the threat to the officers justified the amount of force that Defendants used. Under the second *Graham* factor, Plaintiff himself posed less of an immediate risk to Defendants considering that the three Defendants were punching and kicking

---

[13] Plaintiff states that he refused to give up his hands to protect his head and face from injuries. (ECF No. 33-1, PageID.484.) But the Court must consider "the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene," *Shumate*, 44 F.4th at 440, and cannot inquire into Plaintiff's subjective reasons for his actions.

Plaintiff while he was on the ground. Even if Plaintiff had a weapon hidden in his clothing, it was nearly impossible that he would be able to access it given the circumstances. At the same time, Plaintiff admitted that he continued to actively resist Defendants even when on the ground, although this was in the form of refusing to give up his hands and not a violent act like punching or kicking. However, under "the totality of the circumstances," the Court must still consider that the arrest was taking place in a high-risk environment. The two fugitives remained in the home with access to approximately twenty-five firearms. (ECF No. 29-12, PageID.208; ECF No. 33-1, PageID.470.)

Considering that Plaintiff himself posed less of an immediate threat to Defendants from the ground, and Defendants delivered several blows to Plaintiff's head, there is a genuine issue of material fact as to whether Defendants' use of force after Plaintiff's fall was unreasonable.

However, even if Defendants' use of force was unreasonable, Plaintiff must show that "its unreasonableness was 'clearly established at the time.'" *Ashford*, 951 F.3d at 801 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). To do so, Plaintiff must demonstrate that "'then-existing precedent' put the illegality of [the defendant's]

conduct 'beyond debate.'" *Id.* Further, "[t]he law must have been so clear that *every* reasonable officer in [the defendant's] shoes would have recognized that the force used was excessive—and not just in the abstract but in the *precise* situation [the defendant] was facing." *Id.* Plaintiff "must point to precedent finding a Fourth Amendment violation in similar circumstances or (failing that) show that this is the rare obvious case in which no precedent is needed." *Id.* (internal quotation marks omitted).

Plaintiff cites to one case—*Flanigan v. Panin*, 724 F. App'x 375 (6th Cir. 2018)—to support that the unreasonableness of Defendants' use of force was "clearly established." (*See* ECF No. 32, PageID.237–240.) But *Flanigan* is distinguishable from this case. *Flanigan* found that "the right to be free from fifteen to twenty hits to the head was clearly established" as it amounted to gratuitous force. *Flanigan*, 724 F. App'x at 379. The dashcam footage in this case shows approximately seven hits to Plaintiff's head, which is substantially fewer that the fifteen to twenty hits in *Flanigan*. In addition, the plaintiff in *Flanigan* "did not fight back against [the officer's] attempts to handcuff him," which led the Sixth Circuit to find that "[the officer's] blows to [the plaintiff's] head were

gratuitous." *Id.* at 379. In contrast, it is undisputed that Plaintiff resisted Defendants' attempts to handcuff him.

Other cases involving gratuitous use of force consider the clearly established right of people who pose no safety risk to officers. *See, e.g.*, *Baker v. City of Hamilton*, 471 F.3d 601, 608 (6th Cir. 2006); *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006). Given the heightened risk environment of the scene and the fact that Plaintiff refused to willingly provide his hands, Plaintiff fails to demonstrate that these cases "clearly establish" that his constitutional rights were violated. Thus, Defendants Thomas, Bledsoe, and Chenet are entitled to qualified immunity for their use of force after Plaintiff fell to the ground.

### C. Defendant Thomas' Use of the Taser

Thomas' use of the Taser was not visible in the dashcam footage, but all parties agree that Thomas used the Taser twice on Plaintiff. (ECF No. 29, PageID.107–108; ECF No. 32, PageID.229–230). However, the parties disagree as to whether Plaintiff was already handcuffed at the time that Defendant Thomas tased Plaintiff. (ECF No. 29, PageID.107–108; ECF No. 32, PageID.229–230.)

33

Although Plaintiff acknowledges that it was possible that the Taser was deployed before he was handcuffed, he states multiple times at his deposition that Defendant Thomas deployed the Taser for a second time after he was already handcuffed.[14] Given that there is no video evidence showing whether Plaintiff was handcuffed before or after Defendant Thomas used the Taser, Plaintiff's testimony creates a genuine dispute of material fact, and the Court must adopt Plaintiff's version of the facts at summary judgment. *Ashford*, 951 F.3d at 800. Thus, the Court must assume that Plaintiff was handcuffed before getting tased the second time.

Although the first *Graham* factor again weighs in favor of Defendants, the second and third factors favor Plaintiff. The Sixth Circuit has "often found that the reasonableness of an officer's use of a

---

[14] At the hearing on this motion, Defendants argued that Plaintiff's reasons for thinking he was already handcuffed at the time he was tased demonstrate that he lacked the "personal knowledge" needed to defeat summary judgment. But the fact that Plaintiff could not remember the details of his handcuffing with absolute certainty does not mean that he lacked personal knowledge. *Cf. Stiles v. ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 846 (6th Cir. 2016) (stating that the plaintiff's testimony based on hearsay was inadmissible); *Wysong v. City of Heath*, 260 F. App'x 848, 856–57 (6th Cir. 2008) (stating that a plaintiff cannot defeat summary judgment when he "has no memory of the events"). Here, Plaintiff was present at the scene, his testimony was not based on hearsay, and he did not lack all memory of the events.

taser turns on active resistance: 'When a suspect actively resists arrest, the police can use a taser [ ] to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.'" *Kent v. Oakland Cnty.*, 810 F.3d 384, 392 (6th Cir. 2016) (quoting *Rudlaff,* 791 F.3d at 642) (collecting cases). Tasing a suspect once they are restrained is objectively unreasonable in the Sixth Circuit. *See*, *e.g.*, *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) ("[S]triking a neutralized suspect who is secured by handcuffs is objectively unreasonable."); *see also Cockrell v. City of Cincinnati*, 468 F. App'x 491, 496 (6th Cir. 2012) (explaining that an "excessive-force claim is available" when "a law-enforcement official tases a plaintiff who has done nothing to resist arrest or is already detained"). Assuming, as the Court must, that Plaintiff was handcuffed at the time Thomas tased him, he could not have been actively resisting and no longer posed a threat to the officers. Thus, Defendant Thomas' use of a Taser on Plaintiff was unreasonable as a matter of law.

The right not to be tased when restrained is also clearly established. *Browning*, 18 F.4th at 525 ("[I]t [is] clearly established in this circuit that an individual has a constitutional right not to be tased when he or she is not actively resisting"). This is true even though Plaintiff was previously

35

resisting. *See Goodwin v. City of Painesville*, 781 F.3d 314, 324 (6th Cir. 2015) ("We have held that even previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance.").

Accordingly, Defendant Thomas is not entitled to qualified immunity as to his use of the Taser, and the Court must deny summary judgment as to this use of force. *Thompson v. City of Lebanon*, 831 F.3d 366, 370 (6th Cir. 2016) ("If the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, it must deny summary judgment.").

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment. Summary judgment is denied as to Defendant Thomas' use of the Taser and granted as to all other uses of force by Defendants Thomas, Chenet, and Bledsoe. Accordingly, only Defendant Thomas remains in the case. The only issue remaining is whether Defendant Thomas' use of the Taser violated Plaintiff's Fourth Amendment rights.

IT IS SO ORDERED.

Dated: March 29, 2023        s/Judith E. Levy
Ann Arbor, Michigan         JUDITH E. LEVY
                            United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 29, 2023.

                            s/William Barkholz
                            WILLIAM BARKHOLZ
                            Case Manager